FILED

04/15/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 19, 2019 Session

## STATE OF TENNESSEE v. RHASEAN LOWRY

**Appeal from the Criminal Court for Hamilton County**
**No. 294418     Don W. Poole, Judge**

### No. E2019-00113-CCA-R3-CD

Aggrieved of his Hamilton County Criminal Court jury convictions of felony murder in the perpetration of aggravated child abuse and aggravated child abuse, the defendant, Rhasean Lowry, appeals. The defendant alleges that the trial court erred by denying his motion to disqualify the Hamilton County District Attorney General's Office, by admitting into evidence photographs taken during the victim's autopsy, by refusing to provide a jury instruction on facilitation as a lesser included offense of felony murder and aggravated child abuse, and by denying his motion for new trial based upon the admission of certain testimony. He also contends that the evidence was insufficient to support his convictions. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. THOMAS T. WOODALL, J., filed a separate concurring opinion.

Daniel J. Ripper, Chattanooga, Tennessee, for the appellant, Rhasean Lowry.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Neal Pinkston, District Attorney General; and Cameron Williams and Lance Pope, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Hamilton County Grand Jury charged the defendant with one count of felony murder in the perpetration of aggravated child abuse, one count of aggravated child abuse, one count of rape of a child, and one count of making a false police report in conjunction with injuries inflicted on three-year-old T.E. that eventually led to her death.

Prior to trial, the State dismissed the charges of rape of a child and making a false report, and the case proceeded to trial on the remaining two counts in December 2017.

At trial, registered nurse Deborah Kay Blevins testified that she was working when the victim was brought into the emergency room at Parkridge Medical Center on August 26, 2014. Ms. Blevins recalled that the attending physician, Doctor Bryan Vance, carried the victim inside from the parking lot and placed her on a stretcher, and Ms. Blevins "immediately started chest compressions." The victim "was pulseless, breathless, her pupils were fixed, her eyes were open, she was cool to the touch." Ms. Blevins observed that "[t]he whole entire lobe of [the victim's] ear was black, and around in front of her ear and behind it was black." Ms. Blevins said that she pointed out the discoloration to Doctor Vance, saying, "I didn't know exactly what the story was at that time, but I could tell that she had trauma to her head." Ms. Blevins remembered that a man came into the room later, but she "never really paid attention to him." She added, "He had no emotion, he was quiet, . . . except for a couple of questions that they asked him, he didn't say or do anything. He was not tearful."

After approximately 15 minutes of resuscitation efforts, medical personnel were able to restart the victim's pulse, and she was immediately placed into a waiting ambulance and taken to TC Thompson Children's Hospital at Erlanger Medical Center ("Children's Hospital").

Doctor Bryan Vance testified that he was standing at the front desk of the emergency room at Parkridge Medical Center on August 26, 2014, when a nurse mentioned that someone needed help getting a patient out of a car, so he went to help. He said that he did not get "a sense that it was something urgent, so I thought I would just go out and look to see who needed help." When he walked outside, Doctor Vance did not see anyone parked in the loading and unloading area just outside the doors. Eventually, he saw the defendant standing in the parking lot and "summoning me over with his hand." He described the defendant's demeanor as "matter-of-fact" and said that he "continued to believe that I was maybe just assisting someone who just needed a little bit of help, not that there was something urgent going on." Doctor Vance said that when he approached the vehicle, he saw the victim "just sitting in the backseat with a sippy cup in her lap but not holding it, and her head was to the side and she was just staring forward with a gray appearance to her." Doctor Vance also observed "blood on the corner of her mouth," some bruising "right at the top of her jaw, around the neck," and "a swelling and a bruise" on her ear. At that point, the defendant commented that the victim had been "drinking milk and fell" and that "she wasn't acting right."

-2-

Doctor Vance testified that he put his hand on the victim's chest and neck in an attempt to determine whether she was breathing or had a pulse, but he "did not expect to find either; she looked dead to me at that time." When he felt no pulse or respirations, Doctor Vance picked the victim up in a manner designed to "protect[] her cervical spine as best as I can in case there's an injury to her neck" and "then ran, as probably fast I've ever run, straight back into the emergency department with her."

Once inside the hospital, Doctor Vance placed the victim on a bed in one of the trauma rooms, and "a lot of things began to happen at once." Medical personnel placed a cervical collar on the victim, intubated her, and then began performing cardiopulmonary resuscitation ("CPR") and administering intravenous medication and fluids "using a small drill to put an IV into her lower leg." After what he deemed "an extended period of time," they "eventually did get a heartbeat back." Doctor Vance immediately began the process of transferring her to Children's Hospital, saying,

> I wasn't sure what the extent of her internal injuries were. Obviously, she was injured severely or her heart would not have stopped beating, so, you know, part of being the ER doctor is recognizing when it's beyond you. And this was beyond me, I'd done what I can do, that's my job, to stabilize her, and I need to get her to more advanced care.

Chattanooga City Police Department ("CPD") Officer Caleb Brooks worked as a crime scene investigator in August 2014. On August 26, 2014, he went to Children's Hospital to document the victim's injuries. When Officer Brooks arrived at the pediatric intensive care unit, the victim was lying on her back with "multiple cords and lines and medical equipment coming about her body," "a neck brace on her neck, with gauze secured underneath the chin area," and "numerous medical staff around her, giving her treatment at the time." Fifteen photographs were exhibited to his testimony and displayed to the jury. Officer Brooks identified bruising on the victim's ears, the left side of her chest, lower abdomen, upper left arm, and lower back. He said that he noticed patterned bruising "like the shape of a strap or a belt" on both her legs and a "large gash" inside her lower lip.

Kanti Patel, manager of the Econo Lodge motel on Bonny Oaks Drive in Chattanooga, testified that he was working the front desk on August 26, 2014, when, just before 10:00 a.m., the defendant came into the office "to make the payment for the second day. . . . He made his payment and I gave him the key." Surveillance video from the motel from that morning was played for the jury.

CPD crime scene investigator Gregory Mardis testified that he photographed the lobby area, front entrance, and the room where the victim had been staying at the Econo Lodge. Mr. Mardis observed "what appeared to be a bloodstain" near a column "on the walkway" as well as "some reddish stains on the concrete, going into the laundry room area." Inside the room where the victim had been staying with the defendant, officers discovered "some bedding and a wash cloth that had bloodstains on them" and bloodstained paper towels inside one of the trash cans. Mr. Mardis collected two pairs of flip flops. The wear pattern on the blue flip flops that belonged to the victim suggested that the shoes had been too big.

Forensic testing confirmed the presence of the victim's blood on the sheets and paper towels taken from the motel room.

CPD Investigator Matthew Puglise, who took over as the lead investigator after the victim died, testified that he responded to the hospital but did not see the victim. Instead, after speaking with the doctors, Investigator Puglise spoke with the defendant and the victim's mother. During that interview, the defendant said that he and the victim's mother had been staying at the Econo Lodge with the victim, her older brother, and her younger sister while the family was in the process of moving. The victim's mother had just started a job at Hardee's, but the defendant did not work. The defendant told Investigator Puglise that

> [a]s he and the victim were coming from breakfast "between 9:45 and 10:00" and he had the baby in a carrier and told the victim to start walking up the stairs while he went to the car to get the baby's bottle. She stopped at the top of the steps to look back, then her flip flop got caught and she started "tumbling." He then saw that she had blood on her lip and "a gash" in her mouth. She complained that her head was hurting. He took her to the room, then he helped her rinse her mouth with water. Then he put ice into a freezer bag and had the victim hold it against her head. When she continued to say that her head hurt, he decided to take her to the hospital. Because he was unfamiliar with the area, he took her to the only hospital that he could recall having seen before. On the way to the hospital, the victim stopped responding about halfway to the hospital and he noticed that she looked sleepy. She was "panting." When he got to the hospital, the victim was just staring straight ahead. The victim was on the "next to the last step" when the "bottom of her flip flop caught." She was "holding a cup of milk" when she fell. He said that

-4-

he picked the cup up and threw it into the trashcan "right there by the Coke machine" when he "came back through" to get ice to put on her mouth. She was on the "backside steps" that were closest to the car.

Investigator Puglise ordered the collection of surveillance video from the Econo Lodge. That video recording was played for the jury. The surveillance video established that the defendant and the victim's mother left the motel at 6:43 a.m., and the defendant may have been carrying a baby carrier. The defendant returned shortly after 7:00 a.m. and exited the car with the baby carrier. The defendant, carrying the baby carrier, and a small boy left at 7:48 a.m. The defendant returned to the motel and exited the car with the baby carrier approximately 10 minutes later. The defendant did not return to his vehicle until 9:49 a.m., when he can be seen carrying the baby carrier to the car. A couple of minutes later, the defendant appears carrying the victim "like a fireman's carry." The defendant put the victim into the car and drove around to the lobby area of the motel. He then went inside and returned to the car approximately three minutes later. The surveillance video established that neither the defendant nor the victim entered the lobby or breakfast area of the motel any time that morning.

Investigator Puglise said that, after viewing the video surveillance footage, he interviewed the defendant for a second time at approximately 6:30 p.m. at the "service center." The video recording was played for the jury but not transcribed. The defendant maintained that the victim had fallen "on the west side" stairs.

During cross-examination, Investigator Puglise acknowledged that he lied to the defendant during the interview. He also acknowledged that although the defendant told him that he had thrown the coffee and milk cups into the upstairs trash can, he did not ask investigators to search those cans. The defendant told him that the victim's flip flops were too big for her, and he agreed that the shoes "looked about a half inch extended from her feet." The defendant told Investigator Puglise that he had placed the victim on the bed and wiped her mouth with paper towels from the bathroom, and Investigator Puglise admitted that DNA testing confirmed the presence of the victim's blood on the sheets and the paper towels.

During redirect examination, Investigator Puglise testified that the surveillance video from the Econo Lodge established that the defendant lied about going to get milk and coffee, lied about going to his car to get the baby's bottle, lied about taking the victim with him to drop her mother off at work, and lied about taking her with him to drop her brother off at school. When he did a walk-through of the motel, he did not observe any evidence of milk having been spilled on the stairs.

Doctor Gregory Talbott, Division Chief and Medical Director of Pediatric Critical Care at Children's Hospital was working as the attending physician on August 26, 2014, and participated in the treatment of the victim. Doctor Talbott testified that when the victim was transferred into his care, "she was recurring mechanical ventilation, she also had a low blood pressure," so medical personnel "were simultaneously trying to resuscitate her, which involves fluids, the administration of medications to try and raise her blood pressure." Additionally, the victim had "bleeding problems" that necessitated a blood transfusion. He said that the victim was "[i]n a critical condition. She was in shock." After engaging someone to continue the resuscitation efforts, Doctor Talbott went to speak with the victim's family. He said that it was "vitally important to have accurate history because it can lead us to potentially have other diagnostic findings and treatment, things that we would need to do based on the history." The defendant provided Doctor Talbott with the same version of events that he had initially provided to the police, telling the doctor that the victim had fallen down "one flight of stairs, which he described as metal stairs with a concrete anti-tread mat" after "she caught the toe of her flip-flops and fell over backwards."

After speaking to the family, Doctor Talbott conducted a more thorough examination of the victim. During this examination, he noted tissue swelling of the left occipital area and pinnae bruising, which he clarified was "bruising around the ear here and onto the earlobe." He stated that the pinnae bruising caused him concern, explaining, "Bruising of the pinnae, or bruising of the earlobes, particularly bilaterally, is highly correlated with inflicted injury on a child." He also noticed "bleeding and bruising lacerations, which are basically cuts on the inside of the lip." He said that these lacerations in addition to the bruised earlobes began "to paint a picture of injury that may not fit the story that was proffered." Doctor Talbott also observed a linear patterned bruise that wrapped around the victim's hip, indicating that she had been "struck with an object that has some flexibility" as opposed to steps, which are inflexible.

Doctor Talbott testified that the victim's neurological examination "indicated profound brain injury." "She had no evidence of cortical brain function, which is upper brain function; things that involve voluntary action." In addition, the involuntary brain functions were absent, demonstrating "no evidence of cerebral or deeper-in stem activity. She was deeply comatose." It was his opinion that "this is a combined brain injury from both traumatic, blunt trauma brain injury, compounded by a period of time when she had cardiorespiratory arrest. At that point, circulation's not adequate to the brain, that adds additional injury." He said that the hemorrhage in the victim's brain was "evidence of abusive head injury" and not attributable to the hypoxic brain injury or to the resuscitation efforts. He stated that when he viewed the images of the victim's brain, he was shocked to see that "[s]he had absolutely terrible brain injury, and honestly, I didn't suspect that she would survive." The victim "had massive swelling

in the brain" as well as "evidence of small areas of bleeding within the brain" and "a small amount of blood outside the brain but beneath the covering of the brain." Later studies and imaging indicated that "she had absence of circulation, which is part of the determination of brain death."

As part of the trauma protocol, medical personnel scanned the victim "basically from the top of the head all the way through the chest and abdomen." On those scans, Doctor Talbott observed "evidence of a splenic contusion, so a bruise of the spleen," which he said was associated with inflicted injury. The victim also had bilateral retinal hemorrhages, which he said "requires a massive amount of force, more than any individual would reasonably handle a child." He said that the bilateral bruising of the earlobes, the pattern bruising on the victim's body, the bruising of the spleen, the presence of retinal hemorrhages, and the evidence of severe traumatic brain injury were all inconsistent with the victim's having fallen down the stairs. He added,

> Most concerning to me, too, was there was no abrasions on her skin, it was all just, it appeared to be more blunt trauma. And from falling down a metal staircase, concrete and anti-slip tread, I would have anticipated some abrasion somewhere on her body. So my concern was that this constellation of findings indicated that this child had suffered inflicted injury.

He emphasized that "it's the overall picture when you put everything together" and that "[n]o one single injury . . . can be indicative of child abuse, but when you put together multiple suspicious injuries, including vaginal injuries, retinal hemorrhages, multiple bruises, pattern bruises, lack of abrasions, when you put the whole picture together, it just doesn't fit the story" given by the defendant. Doctor Talbott said that it was "relatively uncommon" for children to be "injured enough from a flight of stairs to end up in the ICU." He testified that he had never seen a child with a pattern of injuries like those sustained by the victim who had fallen down the stairs.

Doctor Talbott had reviewed photographs taken during the victim's autopsy, including one that documented damage to her vaginal wall. He stated that the victim had a Foley catheter inserted into her urethra during treatment but that it was not placed into the victim's vagina. Additionally, the catheter was very small and made of soft silicone. He said that he had reviewed the notes of the three nurses responsible for placing and maintaining the victim's catheter and noted that, combined between the three nurses, "there's probably 50 years of critical care experience." It was his medical opinion that the catheter could not have caused the injury to the victim's vaginal wall.

Despite the victim's poor prognosis, the doctors continued treating the victim with "support of all the vital organ systems." Doctor Talbott testified that "despite all our efforts," the victim "progressed to brain death and was pronounced dead." Following this declaration, some of the victim's organs were harvested for donation.

During cross-examination, Doctor Talbott testified that he was aware that the victim had been treated for head trauma in October 2013. He acknowledged that his notes indicated that he found "blood around the urethral opening" during his initial examination but explained, "[Y]ou cannot determine if that had come from the vagina and just happened to be around the urethra; they're quite close together. . . . Follow-up examination revealed vaginal injury that we did not see initially . . . ." Doctor Talbott maintained that the victim's injuries were highly correlated with inflicted injury, but he could not say specifically how they occurred or who might have inflicted them. He added,

> I stated it earlier, one specific bruise or one specific injury can come about by a myriad of ways; however, the constellation of findings, and there's a long list of them here, pattern bruising, bruising not consistent with my information from the scene, bleeding . . . in the back of the eyes, further autopsy findings which indicated upper spinal cord injury, broken rib, which was posterior and not correlated with CPR, all of that together does not fit the constellation of findings that would indicate to me it was an accidental injury.

Doctor Talbott insisted that he could, "with medical certainty, say that that pattern bruise, that the child was struck by an object." He also said that he could "tell you that hemorrhaging in the back of the eyes is from axial rotation of the head being shaken. Posterior rib injuries are highly correlated with blunt trauma and abusive injury, not by CPR." Doctor Talbott could not give a specific time that the injuries occurred but he could say that "if this child had had those injuries happen earlier, that resulted in cardiac arrest, she would never have arrived at the hospital alive. So I believe them to be rather approximate to the time that medical care was involved."

Doctor James Kenneth Metcalfe conducted the victim's autopsy on August 31, 2014. Doctor Metcalfe testified that he first saw the victim in the hospital because he "was called by the detectives that this child was about to have organ donation and was on ventilator waiting for that." He said that he was present during the donation surgery, and he also reviewed the video recording of the organ donation surgery so that he could "see what injuries were caused by the surgeon and what were caused by pre-existing happenings." The victim's manner of death was homicide and the cause of death was

"[b]lunt force injuries of head and trunk." "The pattern of injury is consistent with inflicted multiple blunt trauma."

The victim had a number of blunt force injuries to her trunk and extremities. She had at least 70 bruises on her body, including ones on her head, buttocks, chest, back, and hip. He said that more than half of the bruises were to the front of her body. "On the right hip, this is a picture of the trunk and the right buttock and the legs, and there you can see this H-shaped, letter H-shaped mark." There was a row of four bruises on her left leg, and another row of five bruises on the left side of her chest. There were bruises on her left hip that wrapped around her body.

Internally, "there were bruising areas in the lungs, and especially there on the left lung." The victim's "stomach had a large bruise on it, and in the wall and also breaking into the lining, tearing the lining" as well as "bruising in the front middle part of the spleen. . . . And also there's a bruise on the one loop of small intestine." It was his opinion that these injuries were all caused by the same blow based upon "how it looked . . . inside." Doctor Metcalfe testified that the injury to the victim's stomach was in an area that would ordinarily be protected by the ribs and that such an injury would have required "quite a substantial force." He noted that it was "a localized injury" that was "kind of roundish." It was his opinion that "a blow that went up under the rib cage" would have been necessary "to impact the soft part of the abdomen, and then come up under the rib cage. Like an upward force." The instrument or item that caused the blow would have been two to three inches in size. He said that this type of injury would not ordinarily occur from a fall down the stairs "[b]ecause it's up out of the way." The victim also had a fractured rib "with bleeding around it." Part of that injury occurred at the same time as the other injuries on her body but another part showed signs of healing and might have occurred "several days before." He said that neither injury was associated with resuscitation efforts.

Doctor Metcalfe testified that the victim had bruises to the right side of her head, right eye, and right ear, with some "spotty bruising on the scalp above the ear." When he peeled back the victim's scalp, Doctor Metcalfe observed extensive bruising that was indicative of "a substantial force." She also had bruising on the left side of her head and "a fan-shaped, fanning-out shaped, bruise above the ear, above and behind the ear" that "look[ed] like fingers." There were also five bruises across the top of the victim's head that Doctor Metcalfe said were inconsistent with a fall down the stairs. She also had a bruise on her left jaw and left cheek. There was bruising in the inner part of the upper lip as well as a laceration on "the bottom part of the inner lower lip" and a torn frenulum, injuries that would have required "[a] substantial force against the lip . . . something squashing the lips to the teeth. And there was also some bruising on the outside."

-9-

The victim suffered a subdural hemorrhage "mainly on the right side" and a "subarachnoid hemorrhage" that "was toward the back and on the top and sides." She also suffered "a bruise of the brain tissue, cortical contusion," which was a bruise of "the gray matter of the brain," as well as "some hemorrhage in the brain stem." Doctor Metcalfe said that none of the injuries to the victim's brain were attributable to a hypoxic event or to the resuscitation efforts following the hypoxic event, "[w]ith the possible exception of" the "brain stem hemorrhages." He explained,

> So the brain injury, the brain gets shook up and then the tiny blood vessels leak fluid, and what leaks first is water and the brain swells. And then the pressure inside the head, because the brain is so swollen, gets very high and the . . . heart can't even pump blood inside of her head because the pressure inside is so high. And so the brain starts to get soft, that's why they talk about brain death.

Doctor Metcalfe said that the fact that the blood in the victim's brain "is what she already had from the injury," coupled with the absence of internal bleeding in the brain, indicated that the brain injury was not the result of the hypoxic event. He observed hemorrhages in the victim's retinas and "blood around the optic nerve," which, he said, "can occur with substantial force, and especially the blood around the optic nerve." He also documented an acceleration or "whiplash" injury to the victim's spine evidenced by a hemorrhage "between the 3rd and 4th and 5th vertebrae."

Doctor Metcalfe observed "some bleeding and tearing" in the victim's vagina and in the urethra. He said that the injury to the victim's vaginal wall could not be attributed to the placement of the catheter because "it was too much of it, and there was tearing, under the microscope, and bleeding and tearing was off to the side, around the vaginal opening." He said that the pattern of the victim's injuries was not consistent with a fall down the stairs but was instead consistent with "[m]ultiple inflicted injury."

Following Doctor Metcalfe's testimony, the State rested.

Forensic Pathologist Doctor Thomas Young testified on behalf of the defendant that, after having reviewed the evidence provided to him, he concluded

> to a reasonable degree of medical certainty, that the story offered by the defendant here, the child falling down the stairs and then becoming unresponsive and then having the child be resuscitated and then the outcome there in the intensive care

-10-

unit, it is my opinion that the autopsy findings are entirely consistent with that account, and that there are no inconsistencies.

Doctor Young explained that "[o]ne of the things that could happen in a small child that's three years old is that if they get head trauma, even a relatively minor head trauma, the brain will start to swell" and that such a condition "can be made worse by subsequent traumas." He said that he found evidence of coagulopathy, "a disorder of blood clotting," in this case, which, he said, resulted from the victim's having been deprived of oxygen for some 20 minutes. He explained,

> [A]fter a period of 20 minutes or so, if you get the heart going again and the breathing going again, then blood flow is resumed but the blood clotting cells don't work and the blood vessels are leaky. So what then happens is that with that resumption of blood flow, then you start getting all kinds of bruising and bleeding.

He said that the victim's extensive bruising, including the bruising in her brain, was "evidence[] of such bleeding" instead of evidence of blunt force trauma. Doctor Young added that, as a result of the clotting disorder, injuries inflicted before the cessation of breathing and "any handling of the child during the medical care is going to lead to lots and lots of bruises all over her body, and also internally." According to Doctor Young, the "multiple bruises in her scalp, face, mouth and ears, would be expected in this situation" given all the medical interventions following the victim's fall down the stairs.

Doctor Young testified that the presence of "widespread and . . . thin" subdural hemorrhage at autopsy was "not a traumatic thing" but was evidence of "a lack of oxygen problem for a period of time." Additionally, he noted that the "bleeding below" the subarachnoid membrane was "over a broad area" and concluded that the bleeding was "not a result of trauma, it's a result of going for a period of time without oxygen." He clarified that the victim

> did have a traumatic injury: She fell down a set of stairs. If maybe her coagulation system was working properly, the bruise wouldn't have showed up, but the fact that she's got a vulnerability to it, she does have one area where there's some bruising of the brain tissue, it's a contusion.

Doctor Young also opined that the swelling of the victim's brain, rather than inflicted trauma, caused both the bruising "in the pons and the midbrain" and the retinal

hemorrhages. He added that it was common for "children who end up on respirators in the intensive care unit, that do not have any trauma," to have retinal hemorrhages.

Doctor Young testified that many of the bruises on the victim's body could be attributed to the handling of the victim's body during her hospitalization, saying, "[A]ny kind of time that they're handling her is sufficient to make bruises in a child whose platelets aren't working and has had damage to the blood vessels as a lack of oxygen." He insisted that what Doctor Metcalfe had deemed a contusion on the victim's lungs was actually "a complication of just being on a respirator." Additionally, Doctor Young maintained that the contusions on the victim's gastrointestinal tract were the result of the combination of the fall down the stairs and the deprivation of oxygen, saying that "in a situation where there is no breathing, blood is shunted away from the gastrointestinal tract" and that "in that kind of a setting, you can get some bloody areas in loops of small intestine and in the stomach, which is what [Doctor Metcalfe]'s describing here in this autopsy." He also maintained that the victim's rib fracture was caused by the administration of chest compressions during CPR and claimed that it was "entirely possible" that the damage to the victim's vaginal wall occurred during the insertion of the Foley catheter. Doctor Young said that hemorrhages in the "anterior paraspinal muscles" were not evidence of an acceleration injury but instead "would be expected" from "hospital personnel handling her and also from a fall down the stairs."

During cross-examination, Doctor Young acknowledged that Doctor Metcalfe's autopsy was thorough, but he testified that Doctor Metcalfe was "drawing the wrong conclusions from what he's seeing." He conceded that "[a]nytime you have a situation where you see a child as bruised up as this child, it's a situation where it demands an explanation," but he said that "[y]ou don't just simply pull the child abuse leverage just because you see bruises, you've got to hear the story." Doctor Young asserted instead that "[t]he trauma here is the minor part." He insisted that although it would be important to assess the accuracy of the defendant's version of events, it was his job to take the defendant's "story as-is and compar[e] it to the findings at the autopsy and seeing if there is a fit or if there is not a fit" and that, in this case, the autopsy findings fit with the defendant's version of events. Doctor Young said that an assessment of the defendant's demeanor at the hospital was not important because "those kinds of human determinations are really inaccurate and heavily influenced by bias."

Doctor Young conceded that, during his tenure as a medical examiner in the early 2000's, he had attributed injuries like those that led to the victim's death to trauma and ruled those deaths as homicides. He explained that his knowledge "basically has been evolving over about 10 years" and that "[t]his business about a lack of oxygen leading to thin subdural hemorrhages, the research on that took place" after those autopsies. He admitted that he had previously testified that bilateral retinal hemorrhages

-12-

were the result of a severe impact to the head or very severe motion inside the cranial vault, but he explained that he no longer "believed in the shaken baby syndrome" because "in pathology, you have this thing called progress, where, basically, people learn things over time and things are discovered."

Doctor Young testified that since having resigned his position as chief medical examiner, he had testified primarily for criminal defendants, many of whom had been accused of murdering children. He admitted that he testified in a Louisiana case on behalf of a defendant accused of beating a 22-month-old child to death that the child's injuries were not the result of abuse but instead the result of a lack of oxygen to the brain. He insisted, on the one hand, that the prosecutor's account of his testimony in the Louisiana case was "not entirely accurate" and, on the other, that he could not "recall the details on the case." Doctor Young conceded that he had testified in an Illinois case involving a 21-month-old child who had over 50 wounds on his body at the time of his death that sleep apnea caused a lack of blood flow, which, in turn, led to a coagulation issue that made it more likely for that child to bruise from medical treatment. He admitted having testified in another Illinois case, this one involving the death of a six-year-old child, that the child's injuries were the result of reduced blood flow that led to coagulation issues that were then exacerbated by resuscitation efforts despite that witnesses observed the defendant in that case beat the child. Doctor Young claimed that he could not recall testifying in a Kansas case involving the death of a six-month-old baby that a fall from a couch caused that child's tibial fracture, subdural hematoma, and bilateral bruising of the ears. Doctor Young admitted that he had testified on behalf of a defendant in a 2016 Marion County case. He insisted, however, that he could not recall testifying that a choking incident caused that child's brain injury and also caused a coagulation issue that resulted in severe bruising. When asked about the similarities between his testimony in each of these cases and in the instant case, he said,

> There may be elements that are similar and then there may be elements that are different. Every case is unique, every case is different. Now, it is true that a lack of oxygen and a lack of blood flow may be a final common pathway in many cases. Not all cases, but in many cases. But the circumstances and the situations that lead up to that are all unique.

He conceded that he had testified in each case that injuries attributed by the State to child abuse were actually the result of leaky blood vessels, but he insisted that he did not "testify according to themes. Okay. Every case is different." He maintained, however, that "having hypoxic problems with the brain is a common problem" and that it was "frequently being misunderstood as being shaken baby syndrome, and maybe that's why it seems to be a common theme to you, but my testimony on this is not stereotyped.

-13-

Every case is vastly different and you really can't compare one to another, like you're trying to do."

Following Doctor Young's testimony, the defendant rested.

Based upon this proof, the jury convicted the defendant as charged of felony murder and aggravated child abuse. The trial court imposed a sentence of life imprisonment for the defendant's conviction of felony murder and, following a sentencing hearing, imposed a concurrent sentence of 15 years for the defendant's conviction of aggravated child abuse.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant asserts that the trial court erred by denying his motion to disqualify the district attorney's office, by admitting autopsy photographs, by refusing to provide a jury instruction on facilitation as a lesser included offense of both charged offenses, and by denying his motion for new trial based upon Doctor Vance's objectionable testimony. He also contends that the evidence was insufficient to support his convictions. We consider each claim in turn.

*I. Disqualification of the Hamilton County District Attorney's Office*

The grand jury returned the indictment in this case in March 2015, and the trial court appointed Steve Brown from the Hamilton County Public Defender's Office, who had been originally appointed to the defendant's case in the general sessions court, to represent the defendant in criminal court. On May 15, 2015, Assistant District Attorney General Leslie Longshore sent a memorandum to Mr. Brown that contained the following:

> Attached are summaries from Myrlene Marsa, Assistant Federal Defender, regarding information her client, Jon Farmer, obtained from Rhasean Lowry. This information was obtained after Lowry and Farmer were placed in the same cell at the jail. Farmer and Lowry came to be placed into the same cell after a proffer session, initiated by Farmer, was held. At the time of the proffer, Farmer had no useful information; however, he indicated that he could get more information if he were placed in the same cell as Lowry. We agreed to have the two placed in the same cell, and the attached information resulted.

-14-

Upon further consideration, I have concerns about the reliability of the information, inmate Farmer's motivation for obtaining this information and the manner in which this information was obtained. Based upon these concerns, Lowry and Farmer are no longer housed in the same cell, and Farmer's attorney has been instructed that we will not be using any information obtained by Farmer.

The State will not seek to use Jon Farmer as a witness, nor will we in any way use the information contained within these summaries against Rhasean Lowry. I have attached the summaries so that you will be assured that this information is not used against your client. Further, these emails were sent only to myself, Assistant United States Attorney Jay Woods and two Federal agents. The investigators involved in the case against Mr. Lowry have not been made aware of this information.

The two attached emails detailed information that Mr. Farmer had gleaned from the defendant. Given the manner of the collection of this information, we do not recite it here.

Following the receipt of General Longshore's memorandum, Mr. Brown moved to withdraw because Mr. Farmer had been represented by the public defender's office "in numerous criminal matters dating back to 1995." Mr. Brown stated that his office's previous relationship with Mr. Farmer and Mr. Farmer's role in obtaining information from the defendant in the manner outlined above created a conflict of interest that prevented Mr. Brown's continuing to represent the defendant. The trial court granted the motion to withdraw and appointed substitute counsel.

In August 2015, the defendant, by his newly-appointed counsel, moved the trial court to disqualify "the entire 11th District Attorney General's office" based on General Longshore's activities. The defendant argued that General Longshore's recruiting Mr. Farmer and placing him in the cell with the defendant to garner information about the case amounted to prosecutorial misconduct. As evidence that General Longshore's actions had tainted the entire Hamilton District Attorney General's Office, the defendant exhibited to his motion an article from the Times Free Press. Pertinent to this issue, the article contained the following:

Longshore declined to comment for this article. Melydia Clewell, spokeswoman for the Hamilton County District

Attorney General's Office, said she could not comment on pending cases.

However, Clewell said that Longshore, Brown, and District Attorney Neal Pinkston met with Judge Don Poole last week to discuss Brown's withdrawal. She said Poole indicated he appreciated Longshore's forthrightness in bringing the situation to Brown's attention and her "upholding to a higher ethical standard than the rules require," Clewell said.

Clewell also provided examples of two Tennessee opinions she said would support the use in court of whatever Lowry told Farmer.

The defendant argued that the spokeswoman's statement to the newspaper indicated that no one in the district attorney's office appeared to grasp the gravity of the impropriety and that, as a result, the office could not be relied upon to protect the defendant's rights going forward. In his response to the defendant's motion, District Attorney General Neal Pinkston averred that General Longshore "has not participated in any prosecutorial work involving the defendant's case and will not participate on any future prosecutorial work." Nevertheless, he observed that General Longshore had "not been disqualified from the prosecution" of the defendant's case but "instead has individually removed herself from the case out of an abundance of caution." He added that General Longshore had not revealed the information she obtained from Mr. Farmer to anyone else in the office and that "[t]he only shared confidences of the defendant that have been revealed in any public forum are because defendant's counsel attached them as exhibits to his motion to recuse the entire office." Additionally, General Pinkston took great personal umbrage at the defendant's suggestion that the conduct of his office had violated the rules of professional conduct. He failed to address, however, the fact that General Longshore's conduct did, in fact, violate the defendant's constitutional right to counsel. Finally, General Pinkston maintained that the manner of its collection did not bar the admission at trial of the information obtained by Mr. Farmer, adding, "The District Attorney General's Office reserves the right to determine whether they will seek to introduce statements made by the defendant to John Farmer."

At the October 12, 2015 hearing on the motion, the defendant argued that General Longshore's actions, which constituted prosecutorial misconduct and a clear violation of the defendant's sixth amendment right to counsel, should be imputed to the entire district attorney's office. He also argued that the fact that General Pinkston continued to entertain the possibility of using information that had been obtained via a clear violation of his constitutional rights indicated that General Pinkston did not

-16-

comprehend the magnitude of the misconduct and could not, therefore, be trusted to implement appropriate screening measures. General Pinkston did not defend General Longshore's actions but insisted that the improperly-obtained information might be admissible and that, because the evidence might be deemed admissible in the future, his office should not be accused of misconduct. General Pinkston did not present any information about what, if any, procedures had been implemented in this case to ensure that the illegally obtained information was not used in any way. Instead, he treated the defendant's request as a personal attack upon his character and professionalism.

The trial court took the matter under advisement. In its order denying the defendant's motion, the court found that the State "does not dispute what was a clear violation of the defendant's right to counsel" and expressed some reservations about the State's response to the defendant's motion as well as General Pinkston's apparent misunderstanding of the circumstances, particularly that General Longshore's conduct violated the defendant's right to counsel. The court refused to exclude "the possibility of disqualification of the entire office in the future on the basis of new developments" but refused to "find an actual or apparent conflict of interest on the part of the entire office on the basis of one, no-longer-participating member's violation of the defendant's right to counsel . . . or the [S]tate's response to the subject motion."

The State did not attempt to admit into evidence at trial any of the information provided by the defendant to Mr. Farmer.

In this appeal, the defendant contends that the trial court erred by refusing to disqualify the entire Hamilton County District Attorney's Office because that office had failed to screen any members from information that had been obtained in violation of his right to counsel. The State asserts that the trial court did not err because the appropriate remedy for the constitutional violation was suppression of the evidence rather than disqualification and because the defendant, and not any member of the district attorney's office, exposed the offending information.

The decision to disqualify an attorney lies within the sound discretion of the trial court, and that decision will not be overturned absent a finding that the court abused that discretion. *See State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003) (citing *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn. 2000)). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

Initially, we note that General Longshore's memorandum to Mr. Brown and the emails attached thereto clearly establish that General Longshore, by arranging for Mr. Farmer to be placed in the defendant's cell for the purpose of obtaining information about this case, violated the defendant's Sixth Amendment right to counsel. The right to counsel embodied in the Sixth Amendment "attaches only at or after the initiation of adversary judicial proceedings against the defendant . . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Gouveia*, 467 U.S. 180, 187-88 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972)). At the time General Longshore made the arrangement with Mr. Farmer's attorney, the defendant had been indicted, the Sixth Amendment right to counsel had attached, and, indeed, counsel had already been appointed to represent the defendant. Consequently, the State had "an affirmative obligation to respect and preserve" the defendant's right to counsel by not acting "in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." *Maine v. Moulton*, 474 U.S. 159, 170 (1985). "[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Id.* at 176.

That being said, "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). In the vast majority of cases, suppression of the illegally-obtained evidence is the appropriate remedy for a violation of the defendant's right to counsel, *see United States v. Henry*, 447 U.S. 264, 273-74 (1980), and there can be no question that, based upon the record, the evidence obtained by Mr. Farmer should have been suppressed. In this case, despite some bluster from the State regarding the potential admissibility of the illegally-obtained evidence, despite General Longshore's assurance that the State would not seek to utilize the information in any way, the State did not seek the admission of any of the information gleaned by Mr. Farmer. In our view, given General Longshore's change of heart, relatively prompt disclosure of the entire nefarious enterprise, and her assurance that she had not and would not disclose the information to anyone else, the exclusion of this evidence was sufficient to remedy the blatant violation of the defendant's right to counsel.

We turn then, to the question whether the trial court should have disqualified the entire Hamilton County District Attorney's Office on the basis of General Longshore's actions as viewed through the lens of the Tennessee Rules of Professional Conduct. We begin by observing that the parties' reliance on Rules 1.9 and 1.11 was inapt. Those rules detail the duties that a lawyer owes to former clients after "switching sides." Rule 1.11 governs the scope of disqualification when the attorney is a current or

-18-

former government employee. "In determining whether to disqualify an attorney in a criminal case, the trial court must first determine whether the party questioning the propriety of the representation met its burden of showing that there is an actual conflict of interest." *White*, 114 S.W.3d at 476. In this case, General Longshore did not, at any point, represent the defendant. Moreover, the information she collected about the case did not arise from her representation of the defendant but instead arose from her, perhaps overzealous, representation of the State. Accordingly, no conflict of interest existed under the Rules that would have prevented her from utilizing that information. Because nothing in the Rules of Professional Conduct prevented General Longshore from revealing the information she obtained from Mr. Farmer to anyone within the district attorney's office, that office was not required to implement any procedures to screen others from the information. That is not to say, however, that General Longshore was not right to try and prevent the dissemination of the information to the prosecutors and investigators working on the defendant's case given that it was obtained in violation of the defendant's right to counsel. That action served to protect the case from any potential taint associated with the constitutional violation.

Moreover, this is not a situation wherein disqualification of the entire district attorney's office was required to negate an appearance of impropriety. Even when "no actual conflict of interest" exists, disqualification may be based on "[t]he 'appearance of impropriety'" as "an independent ground," and, in consequence, "the court must nonetheless consider whether conduct has created an appearance of impropriety." *Clinard*, 46 S.W.3d at 187 (quoting *Culbreath*, 30 S.W.3d at 312-13). That being said, "the mere possibility of impropriety is insufficient to warrant disqualification." *Id.* Instead, "[t]he appearance of impropriety must be real" when examined using an objective standard "determined from the perspective of a reasonable layperson." *See Clinard*, 46 S.W.3d at 187 (citations omitted). Stated differently, "an appearance of impropriety exists 'in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the . . . representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.'" *Id.* (citations omitted). Although General Longshore's questionable conduct violated the defendant's right to counsel, she voluntarily removed herself from the case and attempted to protect the information she had gleaned from disclosure. Under these circumstances, no evidence suggests that the continued participation of the Hamilton County District Attorney's Office "pose[d] substantial risk of disservice to either the public interest or the interest of one of the clients." *See id.*

Finally, the defendant contends that General Longshore violated Rule 4.2, which provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

Tenn. Sup. Ct. R. 8, RPC 4.2. Relative to a prosecutor's duty under this rule, the comments provide:

> Once a represented person has been arrested, indicted, charged, or named as a defendant in a criminal or civil law enforcement proceeding, however, prosecutors and government lawyers must comply with this Rule. A represented person's waiver of the constitutional right to counsel does not exempt the prosecutor from the duty to comply with this Rule.

*Id.*, Comment 5. Based upon the record before us, it appears that General Longshore's actions ran afoul of this rule. That being said, nothing suggests that the impropriety should be imputed to the entire district attorney's office. Instead, the evidence suggests that she acted alone in engaging Mr. Farmer's interactions with the defendant, and, accordingly, her revelation of the information to Mr. Brown and subsequent recusal from the defendant's case was a sufficient remedy for the violation. In consequence, the defendant is not entitled to relief on this issue.

## II. Admission of Autopsy Photographs

The defendant next asserts that the trial court erred by admitting certain photographs taken during the autopsy of the victim, arguing that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. The State contends that the trial court did not err because the photographs were relevant and necessary to aid in the presentation of Doctor Metcalfe's testimony.

Prior to trial, the defendant objected to the admission of various photographs taken during the victim's autopsy.

One photograph depicts the victim lying face down on the autopsy table. The defendant argued that the photograph was superfluous to the diagram drawn by Doctor Metcalfe. The State argued that the photograph demonstrated "a healing rib fracture to a rib in" the victim's back and that the photograph was necessary to rebut the defense expert's theory that the injury was caused by resuscitation efforts. The trial court

deemed this photograph admissible, finding "that the probative value is substantial" and that the photograph was "not gruesome."

The second photograph depicts the victim's internal organs with the victim's ribs retracted. The State argued that the photograph was relevant to show the "damage to [the victim's] internal organs under her rib cage, which would be protected in a fall down the stairs." The trial court concluded, however, that the probative value of the photograph was substantially outweighed by the danger of unfair prejudice and excluded the photograph.

The third photograph, a closeup of the stomach, ostensibly shows the "squishing of the stomach." The trial court admitted this photograph after finding that the probative value was not outweighed by its prejudicial effect.

The next set of photographs depicted the victim's head with the scalp folded back to reveal the soft tissue between the skin and the skull. The State argued that these demonstrated the depth and location of bruises on and behind the victim's ears and scalp to establish that injuries were not the "result of her tumbling and striking her ear on a staircase." The court allowed the photographs as relevant to "better explain[] the testimony of the county medical examiner."

The sixth photograph was a "photograph of the brain, showing . . . blood on the surface of the brain." The State argued that the "photograph demonstrates not just a widespread injury to the brain, but a localized hematoma" and that it was relevant to rebut the testimony of the defense expert "that the hematoma to the brain . . . [w]as a result of resuscitation and possibly not inflicted injury." The trial court excluded this photograph barring later testimony increasing its probative value.

The seventh photograph depicted the victim's "outer genitalia," and the State argued that the photograph was relevant to distinguish the vaginal injury from any injury that might have been caused by the victim's having been catheterized at the hospital. After initially admitting this photograph with the admonition "that nothing concerning sexual assault will be introduced," the trial court later excluded the photograph. The court ruled, however, that the parties could revisit the issue out of the presence of the jury if the defense expert testified that the injury was caused by the insertion of the catheter.

The remaining three photographs to which the defendant objected depicted, according the defendant's argument, the aftermath of the victim's organs having been harvested for donation. Although the record establishes that the parties and the court were examining a set of photographs, it does not clearly establish which set of

photographs. In any event, the trial court determined that the photographs would be admissible if the State cropped the images to remove the indicia of the organ harvesting surgery.

"Tennessee courts have consistently followed a policy of liberality in the admission of photographs in both civil and criminal cases." *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)). "The general rule . . . is that photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" *Carter*, 114 S.W.3d at 902 (quoting *Banks*, 564 S.W.2d at 950-51). Even relevant photographs may be excluded, however, if their probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks,* 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See Banks*, 564 S.W.2d at 951. "The admission of photographs lies within the sound discretion of the trial court and will not be overturned on appeal absent a showing that the trial court abused that discretion." *State v. Odom*, 336 S.W.3d 541, 565 (Tenn. 2011) (citing *Banks*, 564 S.W.2d at 949).

In this case, the record evinces a thoughtful and thorough consideration of each of the challenged photographs and a measured approach to their admission and/or exclusion. To be sure, the record does not establish that the trial court abused its discretion. The photographs, though certainly graphic, were relevant to rebut the defendant's assertion that the victim sustained the injuries by falling down the stairs.

*III. Facilitation Instruction*

The defendant asserts that the trial court erred by denying his request, given at the conclusion of the proof, for a jury instruction on the lesser included offense of facilitation. The State contends that the instructions given were appropriate.

As an initial matter, we note that although the defendant made an oral request for an instruction on facilitation, he did not make the request in writing. Code section 40-18-110 provides, in pertinent part, as follows:

> Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, the lesser included offense instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any

-22-

lesser included offense may not be presented as a ground for
relief either in a motion for a new trial or on appeal.

T.C.A. § 40-18-110(c).  Because he failed to make a written request, the defendant has
waived plenary review of this issue.  *See id.*; *see also State v. Martin*, 505 S.W.3d 492,
503 (Tenn. 2016) (finding waiver when defendant made an oral request for a lesser
included offense instruction but did not make a written request); *State v. Fayne*, 451
S.W.3d 362, 371 (Tenn. 2014).

"The waiver of a lesser included offense instruction does not, however,
preclude our consideration of the issue under the doctrine of plain error."  *Fayne*, 451
S.W.3d at 371 (citations omitted).  This court will grant relief for plain error only when:

(1) the record clearly establishes what occurred in the trial
court; (2) the error breached a clear and unequivocal rule of
law; (3) the error adversely affected a substantial right of the
complaining party; (4) the error was not waived for tactical
purposes; and (5) substantial justice is at stake; that is, the
error was so significant that it "probably changed the outcome
of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d
274, 282-83 (Tenn. 2000)).  The party claiming plain error bears the burden of satisfying
all five criteria as a prerequisite to plain error review.  *See id.*  Because each factor must
be established, we need not consider all five factors when a single factor indicates that
relief is not warranted.  *Fayne*, 451 S.W.3d at 372 (citing *State v. Bledsoe*, 226 S.W.3d
349, 355 (Tenn. 2007)).  "[A]n error would have to [be] especially egregious in nature,
striking at the very heart of the fairness of the judicial proceeding, to rise to the level of
plain error."  *Fayne*, 451 S.W.3d at 372 (citation omitted) (alterations in *Fayne*).

Here, the defendant did not contend that the victim's injuries were inflicted
by another person, and no evidence suggested that anyone other than the defendant was
involved in the offenses.  The evidence established that the victim suffered the injuries
that led to her death on the morning of August 26, 2014, and that the defendant was her
sole caretaker during that time.  The defendant claimed that the victim's injuries were the
result of a fall down the stairs at the Econo Lodge, but the medical evidence rebutted this
claim.  Consequently, the trial court did not err by refusing to provide the requested
instruction and, therefore, the defendant cannot establish plain error.

*IV.  Testimony of Doctor Vance*

-23-

The defendant contends that the trial court erred by denying his motion for new trial based upon the court's handling of objectionable testimony offered by Doctor Vance. The State asserts that the defendant waived our consideration of this issue by declining the trial court's offer of a curative instruction with regard to the testimony. We agree with the State.

During Doctor Vance's redirect examination, he testified that, based upon his experience, it was his opinion that the victim's injuries were inconsistent with the defendant's explanation that she had tripped and fallen. Instead, he said that it "[l]ooked like she'd been assaulted." The defendant objected to the testimony on grounds that the doctor had made a legal conclusion instead of a medical one. Initially, the trial court overruled the objection but then agreed that using the term "assault" "may be going too far." The court sustained the objection, but the defendant did not ask the trial court to strike the testimony or provide a curative instruction, and the court did not take either action at that point. Later, the trial court revisited the issue sua sponte and indicated a willingness to issue a curative instruction. The defendant declined the offer, noting that he was apprehensive about raising the issue again in front of the jury. During Detective Puglise's testimony, the court revisited the issue and again expressed a willingness "to give an instruction that they should disregard that nonmedical diagnosis" offered by Doctor Vance. The defendant again declined because "if I have you give an instruction, then they get to hear that again." The court said that it thought an instruction could be given without repeating the testimony, but the defendant insisted that he did not want a curative instruction.

In our view, the defendant has failed to establish entitlement to relief on this issue. The defendant objected, and the trial court eventually sustained the objection. Because the defendant did not ask the trial court to strike the testimony and refused the offered curative instruction, he cannot be heard to complain about the deleterious impact of the testimony. Furthermore, the offending testimony consisted of a single, fleeting statement on the first day of a four-day trial. To say that this single error, particularly considered in light of the defendant's complete refusal of remedial measures, more probably than not affected the outcome of the trial simply strains the bonds of credulity. The defendant is not entitled to relief on this issue.

*V. Sufficiency*

The defendant also challenges the sufficiency of the convicting evidence, arguing that the State failed to establish his identity as the perpetrator. The State asserts that the evidence is sufficient.

-24-

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

The defendant was charged with first degree murder, which, in this case, required the State to prove the that the defendant killed the victim "in the perpetration of or attempt to perpetrate . . . aggravated child abuse." T.C.A. § 39-13-202(a)(2). He was also charged with aggravated child abuse, which required the State to establish that he "knowingly, other than by accidental means," treated the victim "in such a manner" that "result[ed] in serious bodily injury to the" victim. T.C.A. §§ 39-15-401(a); -402(a)(1). "'Knowing,'" in this instance, "means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id.* § 39-11-106(20). For purposes of the aggravated child abuse statute,

> "[s]erious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

*Id.* § 39-15-402(d).

The defendant does not challenge the evidence supporting the elements of the offenses, but instead argues that the State failed to establish his identity as the perpetrator. "The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). Whether the State has established the defendant as the perpetrator of the charged offenses beyond a reasonable doubt is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015)

(citing *State v. Thomas*, 158 S.W.3d 361 app. at 388 (Tenn. 2005)); *accord State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982) (citing *Stubbs v. State*, 393 S.W.2d 150, 153 (Tenn. 1965)).

The medical testimony established that the three-year-old victim died as a result of multiple blunt force trauma injuries. Essentially, she was beaten to death. Other evidence, including the defendant's statements to the police and to Doctor Young, established that the victim sustained her injuries while in the defendant's care. The defendant told the police on more than one occasion that he was alone with the victim and her younger sibling after he dropped the victim's mother off at work and the victim's older brother off at school. Sometime between the time the defendant dropped the victim's brother at school and the time the defendant arrived at the emergency room with the victim, she sustained multiple injuries to her head and body. The defendant insisted that the victim sustained the injuries when she fell down the stairs, but the other evidence offered by the State sufficiently rebutted this statement. From these facts, a rational trier of fact could have found beyond a reasonable doubt that the defendant inflicted the injuries that led to the victim's death.

### Conclusion

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE